# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CASSIAN ANDERSON and RODNEY ANDERSON,<br><br>          Plaintiffs,<br><br><br>          v.<br><br><br>AT&T CORP. and C. MICHAEL ARMSTRONG,<br><br>          Defendants. | No. 07 Civ. 5913 (MGC)<br><br>Judge Miriam Goldman Cedarbaum.<br><br>DEFENDANT AT&T CORP.'S ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT OF ROBERT CASSIAN ANDERSON AND RODNEY ANDERSON |

Nicholas K. Lagemann (NL-6488)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

David F. Graham
Rachel B. Niewoehner
SIDLEY AUSTIN LLP
10 South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Attorneys for Defendants AT&T Corp. and
C. Michael Armstrong

Defendant AT&T Corp. ("AT&T"), by its attorneys, for its answer and affirmative defenses to the Complaint of plaintiffs Robert Cassian Anderson and Rodney Anderson, hereby answers as follows:

1.      Plaintiffs bring this action against AT&T and two members of its senior management for securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 that caused plaintiffs to purchase millions of dollars of AT&T common stock at artificially inflated prices on April 27, 2000.

**ANSWER:**

AT&T's answer to the allegations in this paragraph does not address allegations in this paragraph relating to Charles H. Noski or to Mr. Armstrong's alleged liability under Section 20(a) of the Securities Exchange Act of 1934, as the claims relating to those allegations have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364.  AT&T admits that plaintiffs purport to bring this action against AT&T and C. Michael Armstrong for securities fraud under Section 10(b) of the Securities Exchange Act of 1934.  AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegations about plaintiffs' purchase of AT&T common stock and therefore denies the same.  AT&T denies that AT&T or Mr. Armstrong are liable under Section 10(b) of the Securities Exchange Act and denies the remaining allegations in this paragraph.

2.      On April 26, 2000, AT&T successfully completed the largest IPO in U.S. history, pricing 360 million "tracking shares" for AT&T Wireless Group at $29.50 per share and raising $10.6 billion.

**ANSWER:**

AT&T admits the allegations in this paragraph.

3.      Just prior to the IPO, on April 24, 2000 (i.e., three business days before the IPO), AT&T released to the market first-quarter results for its wireless operations. The results – substantially higher than analyst expectations – showed a 40.7% rise in revenues and a 112% rise in cash flow from the first quarter of 1999 for AT&T wireless operations. Based on

these results, AT&T revised upwards from 40% to 45% its previous full-year revenue projections

for its wireless operations. Such positive news seemed to come at an opportune time for AT&T,

given the difficult market for new equity issues that existed then. These impressive results were

widely reported in the newspapers, business press, and internet news and business sites.

**ANSWER:**

     AT&T admits that a press release relating to the performance of the AT&T
Wireless Group mobility unit was issued on April 24, 2000.  AT&T states that that press release
speaks for itself and denies the allegations in this paragraph to the extent they mischaracterize
that release.  AT&T admits that the April 24, 2000 release reported a 40.7% increase in revenues
for the AT&T Wireless Group mobility unit and a 112% increase in EBITDA compared to the
first quarter of 1999.  AT&T further admits that the April 24, 2000 release reported that AT&T
expected EBITDA to grow in the range of 40 to 45 percent for the Wireless Group mobility unit
in the year 2000 when compared to 1999.  AT&T lacks knowledge or information sufficient to
form a belief as to the truth of the allegations relating to analysts' expectations and therefore
denies the same.  AT&T states because the allegations in this paragraph do not identify to whom
AT&T's release "seemed to come at an opportune time," AT&T lacks knowledge or information
sufficient to form a belief as to the truth of those allegations and therefore denies the same.
AT&T further lacks knowledge sufficient to form a belief as to the truth of allegations regarding
the perception by unidentified persons of AT&T's results as "impressive" and therefore denies
those allegations.  AT&T further states that because the allegations regarding the results being
"widely reported" are unspecific, AT&T lacks knowledge or information sufficient to form a
belief as to the truth of those allegations and therefore denies the same.  AT&T denies the
remaining allegations in this paragraph.

     4.  Shortly after the IPO was completed, AT&T released on May 2, 2000 the

rest of its first quarter news. In stark contrast to the pre-IPO announcements, the news was not

good. These results were substantially lower than analyst expectations and previous company

guidance. In particular, the two divisions responsible for more than 75% of AT&T's revenues

experienced slower-than-expected growth in one division and larger-than-expected market share

erosion in the other. The disappointing results led AT&T to revise downwards its full-year

revenues and earnings projections not only for these two divisions, but also for AT&T as a

whole, including its wireless group.

**ANSWER:**

        AT&T admits that AT&T released its first quarter 2000 results on May 2, 2000 and on that day updated its guidance regarding revenue and earnings for 2000, reducing its previous forecasts for AT&T's overall revenue growth rate and earnings per share for the year 2000. AT&T states a transcript of the May 2, 2000 earnings call exists, which speaks for itself. AT&T further states that the May 2 press release speaks for itself. AT&T denies any allegations in this paragraph to the extent they mischaracterize the transcript of the May 2, 2000 call or the May 2, 2000 press release. AT&T admits that on May 2, 2000, AT&T announced that the Consumer Services unit had experienced market share loss among some customers and businesses and that the Business Services unit announced lower growth rate forecasts for the year 2000 than AT&T had previously announced. AT&T admits that the combined revenues of the Consumer Services unit and the Business Services unit constituted more than 75% of all AT&T revenues in 1998 and 1999. AT&T admits that on May 2, 2000, AT&T revised downwards its full year revenue projections for the Consumer Services unit and the Business Services unit, and revised downwards the full year revenue and earnings per share projections for AT&T as a whole. AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegations relating to analysts' expectations and therefore denies the same. AT&T denies the remaining allegations in this paragraph.

        5.     In short, AT&T selectively disclosed its first quarter results to benefit the IPO. AT&T announced good news just before the IPO, and held back the bad news until after the IPO was completed. This caused the price of AT&T common stock to be inflated artificially during that time, including April 27, 2000 when plaintiffs purchased their AT&T shares.

**ANSWER:**

        AT&T denies the allegations in this paragraph.

        6.     AT&T's May 2, 2000, announcement caused a record sell-off of its shares. Plaintiffs and other shocked investors watched AT&T shares suffer their worst one-day loss in 13 years. AT&T's common stock plummeted from $49 per share to $41.94 per share. In the days and weeks since AT&T's May 2 surprise, both the common stock and the wireless shares have continued to decline. Commenting in a May 2, 2000 article appearing on Bloomberg business news, analyst and investor Jana Harris "questioned the timing of the [May 2, 2000] warning":

'I wonder why they didn't make us aware of the problems they were having before now. My strong gut feeling is they wanted the wireless offering to go off well,' Harris said.  'A lot of people feel misguided or somewhat deceived.'

**ANSWER:**

AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegations relating to the cause of any sell-off of shares of AT&T stock and therefore denies the same.  AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding what investors perceived or watched and therefore denies the same.  AT&T admits that AT&T's stock fell from a closing price of $49.00 per share on May 1, 2000 to a closing price of approximately $41.94 per share on May 2, 2000.  AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Jana Harris's position.  AT&T states that the May 2, 2000 Bloomberg news article speaks for itself and denies the allegations in this paragraph to the extent they incompletely quote or mischaracterize that article.  AT&T denies the remaining allegations in this paragraph, which include inappropriate and pejorative characterizations.

## JURISDICTION AND VENUE

**ANSWER:**

7.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa and 28 U.S.C. § 1331. The claims asserted herein arise under sections 10(b) and 20(a) of the Exchange Act as amended, 15 U.S.C. § 78b(b) and § 78t(a) and rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

**ANSWER:**

AT&T denies that false statements were made, and that the Securities Exchange Act or any rules thereunder were violated.  AT&T admits the remaining allegations in this paragraph.

8.     Venue is proper in this district pursuant to section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  AT&T does business in this district, and acts giving rise to the violations complained of occurred in this district.

**ANSWER:**

AT&T denies that false statements were made, and that the Securities Exchange Act or any rules thereunder were violated. AT&T admits the remaining allegations in this paragraph.

9.      In connection with the acts, conduct and other wrongs alleged in this complaint, the defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mail and telephone communications.

**ANSWER:**

AT&T denies that any wrongs were committed as alleged in this complaint. AT&T admits the remaining allegations of this paragraph.

## THE PARTIES

10.      Plaintiffs reside in Nassau County, NY. On April 27, 2000, they purchased 425,000 shares of AT&T common stock at an aggregate purchase price of $20,573,835.80. In making such purchases, plaintiffs relied upon the integrity of the market for AT&T common stock, and suffered damage thereby.

**ANSWER:**

AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph relating to plaintiffs, their residence and their ownership of shares, and therefore denies those allegations. AT&T denies that plaintiffs were damaged as alleged in the complaint.

11.      AT&T is headquartered in New York, NY. It provides voice, data and video telecommunications and services to consumers, large and small businesses, and government entities, furnishing local, domestic, regional, and international telecommunication services. During the relative time period, AT&T moved to acquire several large cable system networks. As described below, AT&T also issued a tracking stock linked to its cellular telephone and wireless operations.

**ANSWER:**

   AT&T admits the allegations in the second and fourth sentences of this paragraph. AT&T admits that it has acquired several large cable system networks, but states that because plaintiffs have not defined the "relative time period," AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegations relating to what AT&T did during that time period and therefore denies the same. AT&T denies the remaining allegations in this paragraph.

   12. Defendant C. Michael Armstrong ("Armstrong") was at the time of the

actions complained of herein AT&T's Chairman and Chief Executive Officer.

**ANSWER:**

   AT&T admits that C. Michael Armstrong was AT&T's Chairman and Chief Executive Officer at the time of the actions complained of in the complaint.

   13. Defendant Charles H. Noski ("Noski") was at the time of the actions

complained of herein AT&T's Chief Financial Officer and Senior Executive Vice President.

**ANSWER:**

   AT&T is not required to answer this paragraph, as the claims relating to the allegations in this paragraph have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364.

   14. Defendants Armstrong and Noski, collectively, are referred to herein as

the "Individual Defendants."

**ANSWER:**

   AT&T's answer to the allegations in this paragraph does not address allegations in this paragraph relating to Mr. Noski, as the claims relating to those allegations have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364. AT&T admits that plaintiffs refer to Mr. Armstrong as an "Individual Defendant" in their complaint.

   15. At the time of plaintiffs' purchases, the Individual Defendants were privy

to confidential and proprietary information concerning AT&T, its operations, finances, financial

condition, and present and future business prospects. The Individual Defendants also had access

to material adverse non-public information concerning AT&T, as discussed in detail below. Because of their board memberships, committee memberships, and top executive and managerial positions with AT&T, both of the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, both of the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**ANSWER:**

AT&T's answer to the allegations in this paragraph does not address allegations in this paragraph relating to Mr. Noski, as the claims relating to those allegations have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364. AT&T admits that Mr. Armstrong has at various points in time had access to certain non-public information about AT&T, but AT&T states that because the allegations relating to that information are non-specific, AT&T lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies the same. AT&T denies the remaining allegations in this paragraph.

16.    Each of the defendants is liable as a direct participant in, and a co-conspirator with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior officers and directors, were "controlling persons" within the meaning of section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of AT&T's business.

**ANSWER:**

AT&T's answer to the allegations in this paragraph does not address allegations in this paragraph relating to Mr. Noski or to Mr. Armstrong's alleged liability under Section 20(a) of the Securities Exchange Act of 1934, as the claims relating to those allegations have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364. AT&T denies the remaining allegations in this paragraph.

17. The Individual Defendants, because of their positions with the Company,

controlled and/or possessed the authority to control the contents of its reports, press releases and

presentations to securities analysts and through them, to the investing public. The Individual

Defendants were provided with copies of the Company's reports and press releases alleged

herein to be misleading, prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected. Thus, each of the defendants

had the opportunity to commit the fraudulent acts alleged herein.

**ANSWER:**

AT&T's answer to the allegations in this paragraph does not address allegations in this paragraph relating to Mr. Noski or to Mr. Armstrong's alleged liability under Section 20(a) of the Securities Exchange Act of 1934, as the claims relating to those allegations have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364. AT&T admits that Mr. Armstrong has at certain times been provided with copies of AT&T's reports and press releases prior to or shortly after their issuance, but AT&T states that because the allegations about such reports and releases are unspecific, AT&T lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies the same. AT&T denies that reports or releases were misleading or needed to be corrected, denies that fraudulent acts occurred and denies the remaining allegations in this paragraph.

18. Each of the defendants had substantial motives for committing the fraud

complained of herein in order to ensure the successful completion of the IPO on April 26, 2000.

**ANSWER:**

AT&T's answer to the allegations in this paragraph does not address allegations in this paragraph relating to Mr. Noski, as the claims relating to those allegations have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in

*Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364. AT&T denies the remaining allegations in this paragraph.

## DEFENDANTS' MISREPRESENTATIONS PROXIMATELY CAUSED PLAINTIFFS' DAMAGES THROUGH A FRAUD ON THE MARKET

19.     At all relevant times, the markets for AT&T's securities were efficient. They promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in AT&T's stock prices.

**ANSWER:**

AT&T admits that the markets for AT&T's securities are sometimes efficient. AT&T lacks knowledge or information sufficient to form a belief as to the truth of allegations in this paragraph relating to the digestion of information by the numerous and various persons comprising "the markets for AT&T's securities" and therefore denies the allegations in this regard. AT&T denies the remaining allegations in this paragraph.

20.     The common stock of AT&T was listed and actively traded on the New York Stock Exchange. Its volume averaged at least 15.6 million shares daily. AT&T filed periodic public reports with the SEC, and was followed by analysts from major brokerages, including A.G. Edwards, ABN AMRO, Banc of America Securities, Bear Stearns, CIBC World Markets, Credit Suisse First Boston, Deutsche Bank, Donaldson Lufkin & Jenrette, Goldman Sachs, HSBC Securities, ING Barings, Lehman Brothers, Merrill Lynch, Morgan Stanley Dean Witter, Needham & Company, Inc., Nomura International, PaineWebber, Prudential Securities Robertson-Humphrey, Salomon Smith Barney, and UBS Warburg. The reports of these analysts were redistributed to their customers and the public at large and AT&T regularly issued press releases which were carried by national newswires. As a result, the market for AT&T securities promptly digested current information with respect to AT&T from all publicly-available sources, and reflected such information in AT&T's stock and option prices. Plaintiffs relied on the integrity of the market price of AT&T's publicly traded securities.

**ANSWER:**

AT&T admits that its stock has been listed and actively traded on the New York Stock Exchange. AT&T states that because the allegations about the average trading volume of AT&T's stock do not specify a time period, AT&T lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies the same. AT&T admits that AT&T has at various times filed public reports with the SEC. AT&T further admits that it has been followed by analysts from brokerage houses, including many of those identified in this paragraph, but AT&T lacks knowledge or information sufficient to form a belief as the truth of the allegations that every brokerage identified in this paragraph has followed AT&T and therefore denies the same. AT&T states that because the allegations in this paragraph relating to the distribution and circulation of reports issued by brokerage houses are unspecific, AT&T lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies the same. AT&T lacks knowledge or information sufficient to form a belief as to the truth of allegations in this paragraph relating to the digestion of information by the numerous and various persons comprising "the markets for AT&T's securities" and therefore denies the allegations in this regard. AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegations relating to plaintiffs' subjective reliance on the market price of AT&T's publicly traded securities and therefore denies the same. AT&T denies the remaining allegations in this paragraph.

21.     Material news concerning AT&T's business and prospects had an immediate effect on the market price of AT&T securities, as evidenced by the market price declines in the immediate aftermath of AT&T's May 2, 2000 announcement.

**ANSWER:**

AT&T states that its stock price at any given time is the result of numerous, complex phenomena. As a result, AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

22.     When they invested in the Company's securities, plaintiffs did not know of the wrongful conduct alleged herein and could not have reasonably discovered those facts.

**ANSWER:**

AT&T denies that wrongful conduct occurred as alleged in the complaint. AT&T further states that it lacks knowledge or information sufficient to form a belief as to the truth of allegations about plaintiffs' subjective knowledge and therefore denies the same.

## SUBSTANTIVE ALLEGATIONS

23.    In April 2000, AT&T undertook the largest initial public offering ("IPO") in United States history against a backdrop of a weak market for IPOs in general at that time. AT&T sought to sell 360 million "tracking shares" for AT&T's Wireless Group.[1] With each of these shares preliminarily priced to be offered at $26-$32 per share, AT&T hoped to raise between $9.36 billion and $11.52 billion from this sale of stock.

**ANSWER:**

AT&T admits that the initial public offering of Wireless tracking stock, pursuant to which 360 million shares of Wireless tracking stock were issued, was completed in April 2000. AT&T further admits that it had estimated that the pricing range for Wireless tracking stock would be between $26 and $32 per share prior to setting the price at $29.50 per share, that 360,000,000 shares times $26 equals $9.36 billion, and that 360,000,000 shares times $32 equals $11.52 billion. AT&T admits that the explanation of tracking shares in this paragraph is correct but denies that the allegations in this paragraph present a complete explanation of tracking stock. Because the allegations regarding a "weak market for IPOs" are unspecific, AT&T lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies the same.

24.    In order to ensure the success of this unprecedented offer during the weak IPO market, AT&T engaged in an all-out publicity blitz. AT&T's roadshow efforts included 72 one-on-one meetings with institutional investors in 26 cities, 24 group gatherings, and five conference calls.

**ANSWER:**

AT&T admits that in April 2000, some of AT&T's executives participated in a "roadshow" relating to the Wireless Group tracking stock IPO, and that there were 72 one-on-one meetings, 24 group meetings, and five conference calls in 26 cities. AT&T denies the remaining allegations in this paragraph.

25.    On April 24, 2000 – just before the IPO – AT&T released positive first quarter financial data for the company's domestic wireless operations. This data included: (i)

first quarter 2000 revenues of $2.198 billion, a 40.7% rise in revenues from the first quarter of

1999; (ii) first quarter 2000 cash flow of $430 million, a 112% rise from the first quarter of 1999;

and (iii) a projected 45% increase in cash flow for the entire year, significantly higher than the

40% figure that AT&T had originally offered as an estimate. These figures were reported in

multiple publications (including the Seattle Times and Wireless Today) and on major internet

news services (such as CBS.marketwatch.com and Yahoo) on April 24, 2000. According to a

telecommunications analyst quoted in the Seattle Times on April 24, 2000, AT&T, "concerned a

little bit [about] the stock market," released the sales and earnings information before the IPO to

"reassure" investors that the business was growing.

**ANSWER:**

   AT&T admits that on April 24, 2000, AT&T issued a press release relating to the
performance of its Wireless Group mobility unit.  AT&T states that the April 24, 2000 press
release speaks for itself and denies the allegations in this paragraph to the extent they
mischaracterize that release.  AT&T admits that the April 24 release reported first quarter 2000
EBITDA for the Wireless Group mobility unit of $430 million, which was reported to be a 112%
increase from the first quarter of 1999 and projected EBITDA growth in the range of 40 to 45%
in the year 2000 when compared to 1999 for the Wireless Group mobility unit, which is higher
than the prior forecast of growth in the range of 35 to 40 percent.  AT&T admits some or all of
that the information contained in the April 24, 2000 press release was reported in some, but not
all, of the publications identified in this paragraph, as well as in other publications.  AT&T
denies that the Seattle Times article referred to in this paragraph was published on April 24,
2000.  AT&T further states that the Seattle Times article referred to in this paragraph speaks for
itself and denies the allegations of this paragraph to the extent they incompletely quote or
mischaracterize that article.  AT&T denies the remaining allegations of this paragraph.

   26.  This disclosure provided a vital push to AT&T's IPO, whose progress was

keenly scrutinized by investors for possible signs about the once-furious and now moribund IPO

market.  The technology stock sell-off which sent Nasdaq tumbling into a bear market as of April

2000 had the effect, as many analysts and writers noted, of suddenly decimating the number of

---

[1]  Tracking shares, unlike common stock, do not confer upon investors who hold them any ownership right in
the company. Rather, tracking shares are issued to 'track" or mirror a segment of a company's operations, and offer
investors an economic interest based upon the specific operations tracked.

companies undertaking initial public offerings. See, for instance, the article written by Denise

Duclaux and distributed over Reuters newswires and the internet, titled "IPO VIEW-AT&T

Wireless may color new-issues market." The article, like many others, noted the unprecedented

size of AT&T's offering at the most inauspicious time for new equity issues in years:

> AT&T Corp.'s $10 billion wireless tracking stock is poised to debut in a shaky market that has pushed the majority of newly public companies below their offering price and forced other businesses to scrap their initial public offerings altogether. Now all eyes are turned to the behemoth IPO - expected to be the largest in U.S. history, about twice the size of the $5.5 billion IPO of United Parcel Service Inc. last November. Will it nudge the new-issues market to firmer ground with a widely anticipated solid opening this week, or cast an even greater pallor over the arena with an unexpected poor showing?
>
> *****
>
> "If it does well it will hopefully build some confidence in the market – maybe shore up frayed nerves," said Kenan Pollack, money editor at Hoover's On-Line. "More so, if it does postpone or not do well, I think it could send tremors throughout the market. If a high-quality blue chip can't make it, then start-ups are going to really have a hard time."
>
> *****
>
> Initial public offerings are already struggling after a stellar run that began in November 1998 and lasted through early this year. The new issues pool hit a roadblock as the Nasdaq, where most companies begin trading, suffered a string of harsh losses that led up to the index's biggest one-day point drop in history on April 14.
>
> *****
>
> AT&T Wireless is far from the average initial public offering, which is often a little-known startup with just a few million in revenues. A good showing by the wireless unit, which expects to generate first-quarter revenues of more than $2.1 billion, is expected to have a supportive effect across the slumping new-issues market.
>
> *****
>
> But if AT&T Wireless drops below its offering price or delays its initial public offering like popular Internet portal AltaVista Co. and Web firm Yupi Internet Inc., the repercussions could be felt throughout the new-issues market.

**ANSWER:**

AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegations relating to what unidentified investors "scrutinized" and therefore denies the same. AT&T states that because the allegations relating to analysts' and writers' observations and initial public offerings are unspecific, AT&T lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies the same. AT&T states that the Reuters article referred to in this paragraph speaks for itself and denies the allegations in this paragraph to the extent they incompletely quote or mischaracterize that article. AT&T denies the remaining allegations in this paragraph.

27.    On the strength of AT&T's selective disclosures and relentless publicity campaign, the initial public offering was a success. On April 26, 2000, the tracking shares were priced at $29.50 per share, squarely in the middle of the previously announced $26-$32 range. Remarkably, the offering was *oversubscribed*: the 360 million shares offered by AT&T on April 26, 2000 were insufficient to meet investor demand. After its first day of public trading on April 27, 2000, the tracking shares (trading under the symbol AWE) closed up 7.4% at $31.69 per share. On April 28, the share price appreciated slightly to close at $31.94. The following trading day, May 1, 2000, the tracking stock rose more than 10% to close at $35.25 per share.

**ANSWER:**

Because AT&T denies that there were "selective disclosures," AT&T denies the allegations in the first sentence of this paragraph. AT&T admits that on April 26, 2000, the Wireless tracking stock shares were priced at $29.50 per share. AT&T admits that the Wireless tracking stock closed at approximately $31.94 on April 28, 2000 and $35.25 on May 1, 2000, which is more than 10% higher than $31.94. AT&T admits that the IPO was oversubscribed and that the shares issued were insufficient to meet investor demand, but AT&T denies that such oversubscription was remarkable. AT&T denies the remaining allegations in this paragraph.

28.    That the IPO's success followed positive news about AT&T generally was no surprise. AT&T's prospectus for its Wireless tracking shares acknowledged that the price of the tracking shares could be affected by the performance of AT&T's other business units:

> Holders of AT&T common stock, AT&T Wireless Group tracking stock and Liberty Media Group tracking stock are shareholders of one company and, therefore, financial impacts on one group could affect the other group.

Holders of AT&T common stock, AT&T Wireless Group tracking stock and Liberty Media Group tracking stock will all be common shareholders of AT&T, and will be subject to risks associated with an investment in a single company and all of AT&T's businesses, assets and liabilities. Financial effects arising from one group that affect AT&T's consolidated results of operations or financial condition could, if significant, affect the combined results of operations or financial position of the other groups or the market price of the class of common shares relating to the other groups.

**ANSWER:**

AT&T lacks knowledge or information sufficient to form a belief as to the truth of allegations relating to the "surprise" of unidentified persons regarding the IPO's success and therefore denies the same. AT&T further states that the prospectus referred to in this paragraph speaks for itself and denies the allegations in this paragraph to the extent they incompletely quote or mischaracterize that prospectus. AT&T denies the remaining allegations in this paragraph.

29.     On May 2, 2000 – just four business days after the IPO's completion –

AT&T reported the full truth about its first quarter financial results. It revealed smaller-than-

expected revenue growth and larger-than-expected revenue decline in the company's largest

business segments. This forced AT&T to revise downwards its full-year revenues and earnings

projections for these units and for the company as a whole.

**ANSWER:**

AT&T admits that AT&T released its first quarter 2000 results on May 2, 2000 and on that day updated its guidance regarding revenue and earnings for 2000, reducing its previous forecasts for AT&T's overall revenue growth rate and earnings per share for the year 2000. AT&T states that a transcript of the May 2, 2000 earnings call exists, which speaks for itself. AT&T states that the May 2 press release speaks for itself. AT&T denies any allegations in this paragraph to the extent they mischaracterize the May 2, 2000 earnings call transcript or press release. AT&T admits that on May 2, 2000, it was announced that the Business Services unit would experience lower than expected revenue growth and that its Consumer Services unit would experience a larger than expected decline in revenue. AT&T admits that its Business Services unit and its Consumer Services unit are AT&T's two largest business units as measured in terms of revenues. AT&T denies the remaining allegations in this paragraph.

30.     AT&T's Business Services and Consumer Services together are

responsible for more than 75% of AT&T's revenues. On May 2, 2000, AT&T revealed that they

did not meet the company's previously stated expectations and guidance. AT&T's projections

for its Consumer Services unit's performance, not updated since an October 1999 estimate of a

3-5% revenue fall-off in the year 2000, were revised downwards on May 2, 2000 to estimate a 6-

8% revenue decline from 1999. The first quarter performance of the Business Services unit, the

largest single unit in AT&T, led the company to revise down its estimates for year 2000 revenue

growth from 9-11 % to 8% growth. This downwards revision was particularly surprising to

analysts. As noted in a May 4, 2000 Wall Street Journal article, the rest of the

telecommunications industry was enjoying double digit growth at that time in sales to corporate

clients. Indeed, on and after May 2, 2000, the head of the Business Services unit acknowledged

that a series of mistakes had led this unit to perform below both its publicly-stated expectations

and the industry in general.

## ANSWER:

        AT&T states that a transcript of the May 2, 2000 earnings call exists, which
speaks for itself.  AT&T states that the May 2 press release speaks for itself.  AT&T denies any
allegations in this paragraph to the extent they mischaracterize the May 2, 2000 earnings call
transcript or press release.  AT&T admits that the combined revenues of AT&T's Consumer and
Business Services units in 1998 and 1999 constituted more than 75% of AT&T's overall
revenues.  AT&T admits that on May 2, 2000, AT&T's projections for its Consumer Services
unit were revised to reflect larger revenue declines than the prior estimate of 3 to 5% revenue
decline for the year 2000 and that its projections for the Business Services unit were revised to
reflect pro forma revenue growth of 8% for 2000, as compared to previously forecast pro forma
revenue growth of 9 to 11% for 2000.  AT&T lacks knowledge or information sufficient to form
a belief as to the truth of allegations about the subjective perceptions of analysts in the fifth
sentence of this paragraph and therefore denies the same.  Because the allegations in the sixth
sentence relating to the performance of the rest of the industry are indefinite, AT&T lacks
knowledge or information sufficient to form a belief as to the truth of those allegations and
therefore denies the same.  AT&T further states that the Wall Street Journal article referred to in
this paragraph speaks for itself and denies the allegations of this paragraph to the extent they
mischaracterize that article.  AT&T states that a transcript of the remarks of the head of the
Business Services unit exists, which speaks for itself.  AT&T denies that the allegations
regarding his remarks completely or accurately reflect the remarks he made during the May 2,
2000 call.  AT&T denies the remaining allegations in this paragraph.

        31.     There is no legitimate excuse for defendants waiting a week to reveal this

bad news. Due to AT&T's sophisticated financial and accounting systems, AT&T was able to

preliminarily determine its quarterly results within 24-48 hours after the end of the quarter and release its quarterly results in 14 business days after the end of the quarter in question. With respect to AT&T's 1st Quarter of 2000, AT&T had completed the "quarter close" and was prepared to release its financial results by April 18-19, 2000. At that time it would normally have reported its 1st Quarter 2000 financial results and had discussions with analysts regarding those results, as well as the overall condition of and trends in AT&T's business. However, AT&T's top executives knew that, as a result of the debacle in AT&T's Business Services segment and its loss of large government contracts, AT&T was going to report slower than forecast 1st Quarter 2000 revenue growth and lower than previously forecast 1st Quarter 2000 earnings per share Defendants knew that they would have to reveal the Business Services debacle, AT&T's lower long-distance revenue growth forecast, and its overall corporate revenue growth forecast after it had just raised both of those significantly at a December 6,1999 analysts' meeting.

**ANSWER:**

> AT&T denies the allegations in this paragraph.

> 32.    Defendants knew that disclosing this negative information at the time that AT&T was attempting to complete the Wireless tracking stock IPO amid tumultuous market conditions would spell disaster for the IPO. Such disclosure would result in a precipitous drop in AT&T's common stock price. This, in turn, would cut the IPO price of the 360 million shares of AT&T Wireless tracking stock by several dollars per share, if not result in the cancellation of that IPO, especially given the disrupted condition of the IPO market at that time.

**ANSWER:**

> AT&T denies the allegations in this paragraph.

33.    Thus, even though AT&T's 1st Quarter 2000 results were ready for release by April 18-19, 2000, AT&T's top executives deliberately concealed and delayed the release of those results to avoid disclosing the adverse information about AT&T's Business Services unit which they knew would accompany those 1st Quarter 2000 results, so that AT&T could complete the important Wireless tracking stock IPO before this negative information became public.

**ANSWER:**

AT&T denies the allegations in this paragraph.

34.    AT&T's delay in releasing this bad news also was completely inconsistent with its normal earnings announcement practice. AT&T's 1st Quarter 2000 results and the associated problems with AT&T's Business Services unit were not publicly revealed until May 2, 2000 – 21 working days after the close of the 1st Quarter 2000, on March 31, 2000. That was the longest delay in at least 10 years. The average number of days required for completion and release of AT&T's 1st Quarter results over the past 10 years has been 13.4 days. Had AT&T kept to that time frame, the bad news would have been released on or about April 18-19, 2000, well before the IPO and well before plaintiffs purchased their AT&T shares at artificially inflated prices.

**ANSWER:**

AT&T admits that it released its overall 1st Quarter 2000 results on May 2, 2000. AT&T denies the remaining allegations in this paragraph.

35.    Long before the IPO, AT&T clearly knew of its deteriorating financial condition. During AT&T's May 2, 2000 conference call, Rick Roscitt, the head of AT&T's Business Services unit, admitted that in February 2000 – long before any disclosure of problems in AT&T's Business Services unit - problems there were so severe that AT&T was already engaged in a significant internal restructuring of that unit, including replacing several top

18

managers. According to Roscitt, AT&T had shuffled too many people too fast across accounts, had broken relationships, was re-deploying people back into sales where they had been before as fast as it could, and was hiring 600 additional people for this unit as fast as it could.  Roscitt said:

> [F]rankly, The mid-1999 reconfiguration of our high-end sales channel had more impact than we anticipated for several reasons.... [W]e realigned the high-end sales team to put a much more - more of an emphasis on data over the voice business further causing a resource realignment as I said that was larger than anticipated.  But we quickly recognized these problems ... The second challenge we faced was something that was an event earlier in history, in early 1999 we announced that we had lost the FTS 2000 government contract. And, while that happened as an event in early '99, the revenue impact as that is being implemented will spread throughout sequential quarters in the full year 2000, so we have a negative growth rate there.

> \* \* \*

> In February 2000, we went through a fairly significant restructure of the AT&T business services organization... to react to some of the situations I outlined and frankly to put more accountability in individual leaders' hands.... [W]e've overhauled the entire failed leadership team....

> \* \* \*

> Ken Fishow... will now lead all of AT&T's business services. Sales has been in place since mid-February. Doing that has made significant changes already in the leadership team.... In terms of hiring we are adding something in the range of 600 additional data and IP skilled people as fast as we can hire and deploy, and we are deploying staff people without replacement from our headquarter's location into field sales, people primarily who had been in sales before, who are reassigning back to sales marketplace.

> \* \* \*

> It's not an industry issue, we really shuffled too many people too fast across accounts, broke a few relationships and, frankly... did not have our eyes squarely focused on it.  We changed out that leadership team in an pretty dramatic way… So, it's... not a particular industry, it is a set of accounts where we, frankly, did not pay enough attention to the high-end and didn't have enough management focus on it.

Later, based on discussions with Roscitt and Armstrong Merrill Lynch wrote:

> [M]anagement continues to emphasize the likely drawn out nature of a material recovery.... Note that AT&T's problems in Business Services are focused in the larger accounts, which account for 40% of divisional revenues. Management's

assessment, after the fact, is the cost reductions applied to this large account function were "misapplied," unfortunately at a time (around the turn of the year) when the transfer of multinational accounts to Concert was causing a churn in sales people and a reallocation of accounting responsibilities. Elite business contracts lost, or new contracts not won, over this period cannot be won back quickly due to the typical industry three-year contract period.

**ANSWER:**

AT&T admits that during the May 2, 2000 conference call, Rick Roscitt, the head of AT&T's Business Services unit at the time, made certain statements.  AT&T further states that a transcript of those remarks exists, which speaks for itself.  AT&T admits that some of the alleged statements and quotations attributed to Mr. Roscitt in this paragraph are close approximations of what he said during the May 2, 2000 conference call but AT&T denies that the allegations in this paragraph accurately or completely reflect the statements Mr. Roscitt made during that conference call.  AT&T denies that Mr. Roscitt stated that there was a "failed leadership team" and denies that Mr. Roscitt described the problems in the Business Services unit as "so severe" in February 2000.  AT&T lacks knowledge or information sufficient to form a belief as to the truth of allegations regarding the basis of the information in the Merrill Lynch report referred to in this paragraph and therefore denies those allegations.  AT&T states that the Merrill Lynch report referred to in this paragraph speaks for itself and denies any allegations in this paragraph to the extent they incompletely quote or mischaracterize that report.  AT&T denies the remaining allegations in this paragraph.

36.     Defendants deception went back ever further than just prior to the IPO. On January 25, 2000, AT&T reported its results for the 4th Quarter and the year of 1999. Over the next few days, its top executives (Armstrong, Sieglitz, Noski, Somers and Roscitt) had a conference call and other communications with top securities analysts. In these communications, AT&T's top executives reaffirmed the representations and forecasts they had made at the December 6, 1999 analysts' conference. They also assured analysts that:

- AT&T was confident that its revenue growth would continue to accelerate.

- Strong pipeline and new General Motors and Acer contracts assured Business Services would grow at 9%-11 % in 2000.

- After a deliberate pause in the 3rd Q 99, Wireless marketing was back to full strength, AT&T's Wireless unit was achieving strong subscriber growth with 440,000 net adds in the 4th Q 1999 – its best 4th Q ever and its best December for net adds ever – allowing it to forecast 20%+ subscriber growth in 2000.

- While AT&T did not disclose its "churn" rate, its churn rates were generally in line with the industry and, on the digital side, a little better than the industry.

- While AT&T had encountered slightly higher than anticipated broadband build-out costs, the broadband build-out was roughly on-track and on budget -

with a unit cost slightly less than planned - proceeding a little ahead of schedule and successfully, with very strong consumer demand.

- Business Services' revenue grew 8.5% in the 4th Q 1999, slightly below the 9%-11 % increase forecasted for 2000. However, better sales execution and a strong pipeline of business due to new multi-year contracts would enable Business Services to grow its revenue by 9%-l 1% during 2000.

- AT&T was still forecasting 00 EPS of $2.10-$2.15, even though 1st Q 2000 EPS would be slightly less than earlier forecast due to higher than anticipated wireless and cable upgrade costs.

**<u>ANSWER:</u>**

AT&T's answer to the allegations in this paragraph does not address allegations in this paragraph relating to Wireless subscribers or purported Wireless churn, as the claims relating to those allegations have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364. AT&T admits that AT&T reported its results for the fourth quarter of 1999 and the year 1999 on January 25, 2000 and that Mr. Armstrong and certain other AT&T executives held a telephone conference with securities analysts on that day. A transcript of these remarks exists, which speaks for itself. AT&T admits that certain AT&T executives reaffirmed some of the forecasts that had been made at the 12/6/99 analysts' conference; stated confidence that revenue growth would continue to accelerate; announced contracts with Acer and General Motors; stated that the build-out was roughly on track and on budget, proceeding a little ahead of schedule and at a unit cost basis that was slightly lower than planned; repeated the forecast that Business Services growth in 2000 would be in the range of 9% to 11%; repeated the forecast that operational earnings per share for 2000 would be in the range of $2.10 to $2.15; noted that first quarter earnings might be slightly lower than earnings during the second quarter and second half of the year; and reported Business Services' revenue growth of 8.5% in the fourth quarter of 1999, which is slightly below the 9% - 11% growth forecast for 2000. AT&T denies that the allegations in this paragraph accurately or completely reflect the statements made on that conference call. AT&T denies the remaining allegations in this paragraph.

37.    Roscitt has admitted to the media that he "knew" that the Business Services unit's revised and increased growth rates announced in December 1999 were false when he saw the January 2000 results – information he "quickly" shared with Armstrong. However, despite a clear duty to correct these statements as their falsity became known, AT&T's top executives decided not to disclose this information then, but rather, to conceal it while waiting for the February 2000 and March 2000 results which, as they knew they would be, were even worse. Thus they made no disclosure, waiting to complete the AT&T Wireless offering.

**ANSWER:**

        Because this paragraph does not identify where it has allegedly been reported that certain statements were allegedly made by Mr. Roscitt, AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegation that such reports were made, and therefore denies the same.  AT&T denies the remaining allegations in this paragraph.

        38.    As set forth above, another set of financial disclosures regarding first quarter results and revised full year revenue projections was issued by AT&T and disseminated to the market on April 24, 2000. In this set of disclosures, AT&T revealed higher first quarter revenue and cash flow figures for its fast-growing wireless operations. Based on these figures, AT&T felt it incumbent to revise and *increase* its previously-stated revenue projections for its wireless operations for the year 2000.

**ANSWER:**

        AT&T states that the April 24, 2000 release referred to in this paragraph speaks for itself and denies the allegations of this paragraph to the extent they mischaracterize that release.  AT&T admits that the April 24 release reported first quarter 2000 EBITDA for the Wireless Group mobility unit of $430 million, which was reported to be a 112% increase from the first quarter of 1999 and projected EBITDA growth in the range of 40 to 45% in the year 2000 when compared to 1999 for the Wireless Group mobility unit, which is higher than the prior forecast of growth in the range of 35 to 40 percent.  AT&T denies the remaining allegations in this paragraph.

        39.    AT&T's release of positive first quarter wireless results together with the first quarter's wireless results and increased full-year wireless projections, also gave rise to a duty to disclose material facts concerning AT&T's first quarter operations in its other business units, including: (i) the fact that the first quarter results for its other and much larger business segments were worse than expected; (ii) the fact that these poor results in its largest divisions would counterbalance the 40% revenue growth of the wireless operations and cause AT&T to report, on a consolidated basis, stagnant revenues and declining operational earnings; and (iii) the fact that in light of these poor results in its largest business units, AT&T – though it would

raise its wireless revenue projections for the full year – would have to cut its overall earnings and revenue projections for the full year.

**ANSWER:**

        AT&T denies the allegations in this paragraph.

        40.     Finally, AT&T's sale of stock in the AT&T Wireless IPO gave rise to a duty to disclose all known material information about the Company.

**ANSWER:**

        AT&T denies the allegations in this paragraph.

## MARKET REACTION TO THE TRUTH REVEALED

        41.     As reported in the May 4, 2000 edition of the Wall Street Journal, "AT&T's disclosures have angered many analysts and investors, who complain that the company knew about these problems for months but didn't make them public. Some note that the disclosures came only after AT&T's initial public offering of its wireless business."

**ANSWER:**

        AT&T states that the Wall Street Journal article referred to in this paragraph speaks for itself and denies the allegations in this paragraph to the extent they incompletely quote or mischaracterize that article.

        *42.     The New York Times later reported on the May 2, 2000 revelations that:*

        AT&T dropped its bomb on the company's investors. AT&T said its operations would grow more slowly and earn less this year than the company had previously led the market to expect… Worst of all, the company said that its unit that sells communications services to business customers, which had been one of its bastions of strength, would miss the previous growth target because it had dropped the ball with some of AT&T's biggest accounts.

**ANSWER:**

        AT&T states that the New York Times article referred to in this paragraph speaks for itself and denies the allegations in this paragraph to the extent they incompletely quote or mischaracterize that article.

43.     According to *The New York Times*:

[T]he manner and timing of the May 2 announcement left a bad taste for many investors and analysts.

Just three business days before AT&T delivered its bad news, the new stock mean to track the company's wireless business, whose offering brought AT&T a $10.6 billion windfall, began trading.

In the days and weeks leading up to the offering, AT&T executives led by John D. Zeglis, AT&T's president, had crisscrossed the country touting the new wireless shares to investor.  And in the course of those discussions, it does not appear that Mr. Zeglis gave even a hint of the problems that AT&T was about to announce, leading some investors to worry that perhaps they had been manipulated.

"Some people said: "Hey, I just met with Zeglis. What's that about?" said one communications analyst, on condition of anonymity.  Had AT&T delayed the announcement of the bad news to avoid tainting the wireless offering, whose ticker symbol is AWE? What would that say about AT&T's communications in the future?

Armstrong did not deny that AT&T had concealed its Business Services problems during the Wireless tracking stock roadshow, rather he said; "We didn't think it was relevant to the AWE offering..." Once again, however, Armstrong misleads. Defendants obviously knew AT&T's total financial condition was relevant to the IPO, or else they would not have delayed revealing the truth about AT&Ts problems until after the offering's completion.

**ANSWER:**

AT&T states that the New York Times article referred to in this paragraph speaks for itself and denies the allegations in this paragraph to the extent they incompletely quote or mischaracterize that article.  AT&T further states that because this paragraph does not identify where or when certain statements were allegedly made by Mr. Armstrong, AT&T lacks knowledge or information sufficient to form a belief as to the truth of the allegation that such statements were made, and therefore denies the same.  AT&T denies the remaining allegations in this paragraph.

## COUNT I

## VIOLATION OF § 10(b) OF THE 1934 ACT
## AND RULE 10b-5 PROMULGATED THEREUNDER

44.     Plaintiffs repeat and reallege each and every allegation contained in the

above paragraphs, as if fully set forth herein. This claim is asserted against all defendants, and

each of them.

**ANSWER:**

AT&T's answer to the allegations in this paragraph does not address allegations
in this paragraph relating to Mr. Noski, as the claims relating to those allegations have been
dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in
*Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364. AT&T
realleges its answers to the above paragraphs and incorporates them in its answer to this
paragraph as if fully set forth herein. AT&T admits that this claim purports to be asserted
against Mr. Armstrong and AT&T but denies that Mr. Armstrong and AT&T are liable as
alleged in the complaint.

45.     Defendants, and each of them, carried out a plan, scheme and course of

conduct which was intended to and did: (i) deceive the investing public, including plaintiffs; (ii)

artificially inflate and maintain the market price of AT&T securities; and (iii) cause plaintiffs to

purchase or otherwise acquire AT&T securities at inflated prices. In furtherance of this unlawful

scheme, plan and course of conduct, defendants took the actions set forth herein.

**ANSWER:**

AT&T's answer to the allegations in this paragraph does not address allegations
in this paragraph relating to Mr. Noski, as the claims relating to those allegations have been
dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in
*Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364. AT&T
realleges its answers to the above paragraphs and incorporates them in its answer to this
paragraph as if fully set forth herein. AT&T denies the remaining allegations in this paragraph.

46.     Defendants (a) employed devices, schemes, and artifices to defraud; (b)

made untrue statements of material fact and/or omitted to state material facts necessary to make

the statements made not misleading; and/or (c) engaged in acts, practices, and a course of

business which operated as a fraud and deceit upon the purchasers and/or acquirers of the

Company's stock in an effort to maintain artificially high market prices for AT&T securities in

violation of § 10(b) of the 1934 Act, 15 U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder,

17 C.F.R. 240.10b-5.  Defendants are sued either as primary participants in the wrongful and

illegal conduct charged herein or as controlling persons as alleged below.

**ANSWER:**

        AT&T's answer to the allegations in this paragraph does not address allegations
in this paragraph relating to Mr. Noski, as the claims relating to those allegations have been
dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in
*Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364.  AT&T
realleges its answers to the above paragraphs and incorporates them in its answer to this
paragraph as if fully set forth herein.  AT&T admits that plaintiffs purport to sue Mr. Armstrong
and AT&T as primary participants or as controlling person but denies that either Mr. Armstrong
or AT&T are liable as alleged herein and denies that any illegal or wrongful conduct occurred as
alleged in the complaint.  AT&T denies the remaining allegations in this paragraph.

        47.      Under Item 303 of the Regulation S-K, promulgated by the SEC under the

Exchange Act, there is a duty to disclose in periodic reports filed with the SEC "known trends or

any known demands, commitments, events or uncertainties" that are reasonably likely to have a

material impact on the company's sales, revenues, income or liquidity, or cause previously

reported financial information not to be indicative of future operating results. 17 C.F.R.

§ 229.303(a)(1)-(3) and Instruction 3. In addition to the periodic reports required under the

Exchange Act, management of a public company has a duty promptly "to make full and prompt

announcements of material facts regarding the company's financial condition." *Timely*

*Disclosure of Material Corporate Developments*, Release No. 34-8995, 1970 WL 5619 (SEC

Oct. 28, 1970). The SEC has repeatedly stated that the anti-fraud provisions of the federal

securities laws, which are intended to ensure that the investing public is provided with "complete

and accurate information about companies whose securities are publicly traded," apply to all

public statements by persons speaking on behalf of publicly-traded companies "that can

reasonably be expected to reach investors and the trading markets, whoever the intended primary

audience." *Public Statements by Corporate Representatives*, Release No. 34-20560 (SEC Jan.

13, 1984). The SEC has emphasized that "investors have legitimate expectations that public

companies are making and will continue to make prompt disclosure of significant corporate

developments." *Report of Investigation in the Matter of Sharon Steel Corp. as it Relates to*

*Prompt Corporate Disclosure*, Release No. 34-18271, 1981 WL 28150 (SEC Nov. 19, 1981).

**ANSWER:**

> AT&T states that the SEC rules and releases referred to in this paragraph speak
for themselves and denies the allegations of this paragraph to the extent they incompletely quote
or mischaracterize those rules and/or releases. AT&T further denies that the allegations in this
paragraph accurately or completely reflect disclosure requirements of the SEC.

> 48. In addition to the duties of full disclosure imposed on defendants as a

result of their making of affirmative statements and reports, or participation in the making of

affirmative statements and reports to the investing public, they had a duty to disseminate

promptly truthful information that would be material to investors, in compliance with the

integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R.

§ 210.1-01 *et seq.*) and S-K (17 C.F.R. § 229.10 *et seq.*) and other SEC regulations, including

truthful, complete and accurate information with respect to the Company's operations and

performance so that the market prices of the Company's publicly traded securities would be

based on truthful, complete and accurate information.

**ANSWER:**

> AT&T states that the SEC regulations referred to in this paragraph speak for
themselves and denies the allegations in this paragraph to the extent they mischaracterize those
rules. AT&T denies that the allegations in this paragraph completely or accurately reflect
disclosure requirements of the SEC. AT&T further denies the allegations in this paragraph to the

extent they imply that AT&T did not disseminate truthful information.  AT&T denies the remaining allegations in this paragraph.

49.    Furthermore, as noted above, AT&T's incomplete disclosure of results on April 24, 2000, gave rise to a disclosure duty, as did AT&T's sale of over $10 billion worth of stock, and AT&T had a duty to correct or update its statements of January 2000, insofar as those statements had become inaccurate in light of subsequent events.

**ANSWER:**

AT&T denies the allegations in this paragraph.

50.    Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial results, businesses, operations, and future outlook as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein, in an effort to assure investors of AT&T's management, value and performance. This included making, or participating in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company's financial and business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaging in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers and/or acquirers of AT&T securities.

**ANSWER:**

AT&T denies the allegations in this paragraph.

51.    The Individual Defendants' primary liability and controlling person

liability arise from the following facts: (i) they were high-level executives and directors of the

Company and were members of the Company's management team; (ii) by virtue of their

responsibilities and activities as senior officers of the Company, they were privy to and

participated in drafting, reviewing, and/or approving the misleading statements, releases, reports,

and other public representations of and about AT&T, and/or signed the Company's public filings

with the SEC, which public filings contained the allegedly materially misleading statements; (iii)

they knew or had access to the material adverse non-public information about the financial

results, business, operations, and future outlook of AT&T which were not disclosed; and (iv)

they were aware of the Company's dissemination to the investing public of information, the

falsity of which they knew or recklessly disregarded.

**ANSWER:**

AT&T's answer to the allegations in this paragraph does not address allegations
in this paragraph relating to Mr. Noski or to Mr. Armstrong's alleged liability under Section
20(a) of the Securities Exchange Act of 1934, as the claims relating to those allegations have
been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in
*Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364.  AT&T
denies that Mr. Armstrong is liable as alleged in the complaint and therefore denies the
remaining allegations in this paragraph.

52.    Each of the defendants had actual knowledge of the misrepresentations

and omissions of material facts set forth herein, or acted with reckless disregard for the truth in

that they failed to ascertain and to disclose such facts, even though such facts were available to

them. Defendants' material misrepresentations and/or omissions were done knowingly or

recklessly and for the purpose and effect of concealing AT&T's operations and business affairs

from the investing public and supporting the artificially inflated price of its securities. As

demonstrated by defendants' statements, if they did not have actual knowledge of the

misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge

by deliberately refraining from taking those steps necessary to discover whether those statements

were false or misleading.

**ANSWER:**

AT&T's answer to the allegations in this paragraph does not address allegations
in this paragraph relating to Mr. Noski, as the claims relating to those allegations have been
dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in
*Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364. AT&T
denies the remaining allegations in this paragraph.

53.    Defendants' motives for inflating the price of AT&T's securities included,

*inter alia*, the desire to raise $10.6 billion through the April 26 initial public offering of AT&T

Wireless tracking stock – the largest IPO in U.S. history. Indeed, defendants themselves admitted

(see ¶28, *supra*), on page 13 of the prospectus AT&T filed with the SEC on April 27, 2000, for

its wireless tracking stock IPO, a concern that negative reports about AT&T or Liberty Media

could have an adverse impact on AT&T Wireless Stock.

**ANSWER:**

AT&T's answer to the allegations in this paragraph does not address allegations
in this paragraph relating to Mr. Noski, as the claims relating to those allegations have been
dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in
*Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364. AT&T
denies the remaining allegations in this paragraph.

54.    As a result of the dissemination of the materially false and misleading

information and/or failure to disclose material facts, as set forth herein, the market price of

AT&T securities was artificially inflated. In ignorance of the fact that market prices of AT&T's

publicly-traded securities were artificially inflated, and relying directly or indirectly on the false

and misleading statements made by defendants, or upon the integrity of the market in which the

securities trade, and the truth of any representations made to appropriate agencies as to the

investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by such defendants, plaintiffs purchased or otherwise acquired for value AT&T securities at artificially high prices and were damaged thereby.

**ANSWER:**

AT&T denies the allegations in this paragraph.

55.     At the time of such misstatements and omissions, plaintiffs were ignorant of their falsity, and believed them to be true. Had plaintiffs and the marketplace known of the true financial condition of the Company, which was not disclosed by defendants, plaintiffs would not have purchased or otherwise acquired their AT&T securities at the artificially inflated prices paid.

**ANSWER:**

AT&T denies that there were any false statements, misstatements or omissions and therefore denies the allegations in this paragraph.

56.     By virtue of the foregoing, defendants have violated § 10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

**ANSWER:**

AT&T denies the allegations in this paragraph.

57.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs suffered damages.

**ANSWER:**

AT&T denies that defendants engaged in wrongful conduct and therefore denies the allegations in this paragraph.

## COUNT II
## VIOLATION OF § 20(a) OF THE 1934 ACT

58.    Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs, as if fully set forth herein. This claim is asserted against the Individual Defendants, and each of them.

**ANSWER:**

AT&T is not required to answer this paragraph, as the claims relating to the allegations in this paragraph have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364.

59.    The Individual Defendants and each of them acted as a controlling person of AT&T within the meaning of § 20(a) of the 1934 Act, as alleged herein. By virtue of their executive positions, each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings, and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER:**

AT&T is not required to answer this paragraph, as the claims relating to the allegations in this paragraph have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364.

60.    In particular, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged

herein, especially by virtue of their senior positions, and exercised the same.

**ANSWER:**

    AT&T is not required to answer this paragraph, as the claims relating to the allegations in this paragraph have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364.

    61.    As set forth above, the Individual Defendants violated § 10(b) and Rule

10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling

persons of AT&T, each of the Individual Defendants is liable pursuant to § 20(a) of the 1934

Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, plaintiffs

suffered damages.

**ANSWER:**

    AT&T is not required to answer this paragraph, as the claims relating to the allegations in this paragraph have been dismissed pursuant to the Joint Stipulation and Order Regarding Effect on Complaint in *Anderson v. AT&T Corp.* of January 30, 2002 Order in Case Number 3:00cv05364.

## AFFIRMATIVE DEFENSES

1.    The complaint fails to state a claim upon which relief can be granted under Fed.

R. Civ. P. 12(b)(6); Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act.

2.    AT&T is not liable for the allegedly false and misleading forward looking

statements because they are entitled to protection under the Safe Harbor provisions of the Private

Securities Litigation Reform Act.

WHEREFORE, AT&T requests an Order entering judgment in its favor, awarding costs and disbursements, and granting such other and further relief as the Court may deem just and proper.

SIDLEY AUSTIN LLP
Attorneys for All Defendants


By:    /s/ Nicholas K. Lagemann
   Nicholas K. Lagemann (NL-6488)
   787 Seventh Avenue
   New York, New York 10019
   Tel: 212-839-5300
   Fax: 212-839-5599

DATED:  September 10, 2007